**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| HALEY JUSTICE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. |
| | § | |
| BOARD OF REGENTS OF TEXAS | § | |
| TECH UNIVERSITY SYSTEM, for and | § | |
| on behalf of TEXAS TECH UNIVERSITY | § | |
| IN LUBBOCK, AND TANNER | § | |
| CEARLEY, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Haley Justice ("Plaintiff" or "Haley"), files this Original Complaint against the

Board of Regents of Texas Tech University System, for and on behalf of Texas Tech University

in Lubbock ("Texas Tech" or "TTU"), and Tanner Cearley ("Tanner"), (collectively,

"Defendants"), and alleges as follows:

**PARTIES**

1.      Haley Justice is an individual who resides in Taylor County, Texas.

2.      Texas Tech University in Lubbock is a public institution of higher education within

the Texas Tech University System operated by the State of Texas. The Board of Regents of Texas

Tech University System is the legal governing body responsible for overseeing the Texas Tech

University System. The Board of Regents of Texas Tech University System may be served through

its Vice Chairman, Dustin R. Womble, at 1508 Knoxville Avenue, Suite 302, Lubbock, TX 79409-

2011, or wherever he may be found.

3.      Tanner Cearley is an individual who resides in Lubbock, Texas. Tanner may be served at 5507 17th St, Lubbock, TX 79416-5308, or wherever he may be found.

## JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it raises a question of federal law under Title IX of the Education Amendments of 1972. 20 U.S.C. §§ 1681–1688. This Court has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367(a) because they are so related to claims in this action within such original jurisdiction that they form part of the same case or controversy.

5.      Further, this Court has personal jurisdiction over the Defendants. Texas Tech University System conducts business in the state of Texas; specifically, Texas Tech University in Lubbock is located within the state of Texas. Tanner is domiciled in the state of Texas.

6.      Venue in the Northern District of Texas is proper under 28 U.S.C. § 1391(b)(1) and (2) and § 1409 because all Defendants are residents of Lubbock, Texas and the events and omissions giving rise to the claims in this suit took place substantially in this judicial district and specifically within the Lubbock Division.

## FACTUAL BACKGROUND

7.      Haley is the daughter of a stay-at-home mom and a retired veteran. Haley was raised in a traditional household and was homeschooled by her mother during high school. When Haley was accepted to attend Texas Tech, the whole family celebrated her achievements. Little did they know that Haley's experience at Texas Tech would cause the biggest trauma of Haley and her family's lives.

8.      During the fall of 2023, Haley began attending Texas Tech in Lubbock as a first-year student living on campus. Despite the difficulties adjusting to the new academic structure and

social environment, including living with strangers at a shared dorm, Haley was excited about school and made conscious efforts to engage with other Texas Tech students and be part of the campus community. During the first few months at Texas Tech, Haley attended classes regularly, maintained satisfactory academic performance, made friends, and engaged in routine social interactions with other students, including attending university events and group study sessions.

9.      Tanner was also a first-year student at Texas Tech. Tanner and Haley participated in a Snapchat group set up for first-year students. Haley first met Tanner in person in or about October 2023 in the elevator of her dorm building. Haley's dorm was located on the 7th and Tanner's on the 6th floor of the same building. After that, Haley had a second encounter with Tanner on or around November 5, 2023, at night, when Tanner invited Haley via text message to watch a movie in his dorm room. Haley was doing homework, and she told Tanner she would let him know whether she would be able to join him after she finished. Later that night, Haley texted Tanner, accepting his invitation. Haley had no history of a romantic or intimate relationship with Tanner.

10.     Just after Haley entered his room and sat on his bed to watch TV, Tanner immediately attacked her. Tanner violently grabbed Haley's neck and collarbone with both hands, forced Haley to lie down, and raped her. Tanner laid on top of Haley and initiated forced intimacy with her. Without her consent, Tanner kissed and grabbed Haley aggressively for several minutes while pressing her neck and collarbone against the bed to prevent Haley from escaping. Tanner then violently removed Haley's shorts and underwear altogether and, using one hand to continue pressing Haley's neck, Tanner introduced his fingers in Haley's vagina and aggressively penetrated her for several minutes. Haley repeatedly begged Tanner to stop and attempted to push him off her multiple times. However, Tanner only stopped when Haley started bleeding from the lacerations in her vagina caused by Tanner violently penetrating his fingers in and out of Haley's body.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                          **PAGE 3**

11.     Tanner demanded Haley go clean herself and, as she attempted to grab her keys to return to her dorm, Tanner threw Haley's keys onto the ledge of the bed and told her to return to his room after she was done. Haley went to the bathroom and, when she returned to Tanner's room, Haley told him that her roommate was sick and needed her help. Tanner then allowed Haley to retrieve the keys to her dorm, and Haley left.

12.     On November 6, 2023, the day after the rape, Haley reported the rape to a Texas Tech Community Advisor, encouraged by a fellow TTU student and friend. On November 8, 2023, Haley submitted a Sexual Misconduct Formal Complaint to the Texas Tech Title IX Office for Student Civil Rights and Sexual Misconduct (SCRSM) after meeting with Meredith Holden ("Meredith"), a SCRSM Case Manager at Texas Tech.

13.     During the days immediately following the rape, Haley suffered from severe vaginal pain and continued to bleed heavily. Haley also noticed and registered images of large bruises over her body, including on her neck, collarbone and hips. Haley further experienced severe emotional distress, including fright, horror, shame, humiliation, worry, anxiety, crying spells, sleep deprivation, and dissociation after being sexually assaulted by Tanner.

14.     Within a few days after being raped, Haley formally reported the rape to the Texas Tech Police Department. A police officer instructed Haley to undergo a SANE (Sexual Assault Nurse Examiner) exam. Haley immediately visited the Voice of Hope for a sexual assault examination. A Voice of Hope nurse examined Haley, collected various swabs from her genitals, and informed Haley that she had scratches on her vaginal walls.

15.     On information and belief, the SANE kit evidence became part of a criminal investigation against Tanner. On September 24, 2024, Tanner was indicted on a felony charge of aggravated assault. On September 25, 2024, the Lubbock County Police arrested Tanner. On or

**PLAINTIFF'S ORIGINAL COMPLAINT**                                              **PAGE 4**

around October 8, 2024, Tanner was released on bond. The criminal case (Cause No. DC-2024-CR-2223) is currently set for trial before the 364th District Court of Lubbock County, Texas.

**I.    TEXAS TECH ACTED WITH DELIBERATE INDIFFERENCE TO THE SEXUAL ASSAULT SUFFERED BY HALEY.**

      **a.  Texas Tech has maintained a policy of deliberate indifference that created a heightened risk of sexual misconduct that was known or obvious.**

16.    As soon as Haley had her first meeting with SCRSM, Texas Tech began trying to convince her to waive her right to an investigation and adjudication of formal complaints under Title IX and agree to an "informal resolution." An informal resolution under Title IX is an alternative process whereby complainant and respondent resolve a sexual offense complaint without a full investigation or hearing by negotiating an agreement with no formal finding of responsibility, no right to appeal, and no disciplinary consequences assessed by the school against the respondent. In other words, an informal resolution is a way for universities to close sexual misconduct cases quietly and out of public view, with no negative impact on their reputation, and, on information and belief, federal funding and grants, as well as budget allocation, which depend on compliance with Title IX and similar legal frameworks.

17.    Notably, in 2023, according to data provided by the U.S. Department of Education, Campus Safety and Security, Texas Tech University was listed as one of the schools with the most dangerous college campuses in Texas.[1] Rules and regulations such as the Texas Education Code and The Clery Act require colleges and universities that receive federal funding to disseminate a public annual security report (ASR) to employees and students. In 2024, Texas Tech released a Chief Executive Officer Report ("CEO Summary Data Report") showing that, from September 1,

---

[1] U.S. Department of Education, *Campus Safety and Security*, https://ope.ed.gov/campussafety/#/institution/details (last visited Nov. 5, 2025).

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                    **PAGE 5**

2023, through August 31, 2024, Texas Tech received 251 reports of sexual misconduct but only conducted twelve (12) formal investigations. Out of the twelve (12) reports investigated, only three (3) were concluded with student disciplinary sanctions.[2]

18.    Texas Tech statistics reveal consistent high levels of sexual misconduct reported throughout the years, minimal interest in investigating such complaints, and irrelevant sanctions against students resulting from investigations. For example, according to the 2023 CEO Summary Data Report, from September 1, 2022, through August 31, 2023, Texas Tech received 296 sexual misconduct reports but investigated only seventeen (17), out of which zero (0) investigations resulted in student disciplinary sanctions.[3] Unsurprisingly, from September 1, 2024, through August 31, 2025, Texas Tech reported 234 sexual misconduct reports received, eleven (11) investigated, and only one (1) investigation concluded with student disciplinary sanctions.[4]

19.    The volume of sexual misconduct incidents reported by Texas Tech shows no significant decrease year over year. Texas Tech refuses to investigate the vast majority of reported incidents. And Texas Tech punishes virtually no one. Texas Tech has maintained a policy of deliberate indifference that creates a heightened risk of sexual misconduct that was known or obvious. Haley directly suffered from the policies of Texas Tech and its deliberate indifference, and she continued to suffer as Texas Tech intentionally pressured her into accepting an informal

---

[2]    Texas    Tech    University    Title    IX,    *Chief    Executive    Officer    Annual    Report    2023-2024*, https://www.depts.ttu.edu/titleix/annualreports/Chief_Executive_Officer_Report_TTU_2024.pdf (last visited Nov. 5, 2025).
[3]    Texas    Tech    University    Title    IX,    *Chief    Executive    Officer    Annual    Report    2022-2023*, https://www.depts.ttu.edu/titleix/annualreports/ChiefExecutiveOfficerReportTTU2023.pdf (last visited Nov. 5, 2025).
[4]    Texas    Tech    University    Title    IX,    *Chief    Executive    Officer    Annual    Report    2024-2025*, https://www.depts.ttu.edu/titleix/annualreports/ChiefExecutiveOfficerReportTTU2025.pdf (last visited Nov. 5, 2025).

resolution instead of concluding a grievance process and imposing proper sanctions against Tanner.

**b.  Texas Tech coerced Haley into agreeing to an informal resolution.**

20.  In the months following her rape, Haley had multiple meetings with SCRMS personnel, including the Case Manager, Meredith, and Andrea Regalado ("Andrea"), a SCRMS Administrative Investigator. Haley's mother attended some of these meetings to provide emotional support. During these meetings, Haley would often relive the intimate details of her rape, providing detailed statements. Texas Tech SCRMS employees took advantage of Haley's fragile situation to push an informal resolution.

21.  Texas Tech SCRMS employees repeatedly told Haley that a formal resolution would be much harder for Haley because she would have to retell the details of her assault multiple times, including as part of the investigation process, and, ultimately, at a hearing in front of Tanner and others. SCRMS employees repeatedly told Haley that through a formal grievance process she would relive her trauma over and over, and the process could take a long time to finish with no certainty of a satisfying outcome for Haley.

22.  Such conduct by Texas Tech SCRMS employees violated Title IX, under which "[a] recipient must not require or pressure the parties to participate in an informal resolution process. The recipient must obtain the parties' voluntary consent to the informal resolution process … ." 34 C.F.R. §106.44(к)(2) (2025).

23.  Ultimately, Meredith and Andrea convinced Haley that an informal resolution was the only way to avoid exposing Haley to stress, scrutiny, and confrontation and "resolve" the matter. On December 2, 2023, and relying on these representations, Haley signed a Consent and Acknowledgement of the Informal Resolution Process ("IR Consent") stating that she voluntarily wished to participate in an informal resolution process. In reality, Haley had been coerced into

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                    **PAGE 7**

agreeing to pursue an informal resolution, waiving her right to a formal investigation and resolution of her claims against Tanner by Texas Tech.

24.     On or around June 4, 2024, Haley succumbed to Texas Tech's pressure and signed an Informal Resolution Agreement ("IR Agreement") closing the investigations by TTU of the rape Haley suffered and resolving the matter without any disciplinary sanctions against Tanner. Haley's decision to go through an informal resolution process and execute the IR Agreement was a result of Texas Tech's coercion—not Haley's voluntary consent, as required by Title IX regulations. *Id*.

### c.  Texas Tech assigned a biased investigator to facilitate informal resolution.

25.     Under Title IX, a school may offer to a complainant and respondent an informal resolution process with no pressure on the parties to accept same. *Id*. Nevertheless, "[t]he facilitator for the informal resolution process must not be the same person as the investigator or the decisionmaker in the recipient's grievance procedures." 34 C.F.R. §106.44(κ)(4) (2025). "Any person designated by a recipient to facilitate an informal resolution process must not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent." *Id*.

26.     Andrea Regalado was the Texas Tech SCRMS Investigator in charge of Haley's case. In addition to meeting and interviewing Haley multiple times to gather facts and evidence, Andrea also interviewed Tanner, Haley's friend, Rylan Berry, Jeweljana Helm, the Community Advisor to whom Haley first reported the sexual assault, Kenzie Segleski, Haley's roommate at the time of the assault, and Jacob Hall, Tanner's roommate at the time of the assault.

27.     Andrea reviewed all available evidence, such as text messages, videos, and photos produced by Haley of bruises over her body, including on her neck, collarbone and hips. Further, Andrea drafted the Investigation Report, a formal written document summarizing the evidence,

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                                                     **PAGE 8**

witness statements, and other information gathered during the investigation of Haley's complaint to be reviewed by all panel members prior to a grievance hearing to support a finding of responsibility and determination of disciplinary sanctions. The Investigation Report prepared by Andrea also included conclusions as to the Code of Student Conduct provisions that Tanner would have violated, and listed specific points of deliberation by the hearing body concerning Tanner's conduct. Clearly, Andrea was never a neutral party in the resolution of Haley's claims against Tanner. Andrea, as the investigator in charge, made preliminary determinations about credibility, and developed opinions about Haley and Tanner.

28. Texas Tech completely disregarded Andrea's bias and purposefully charged her with facilitating the negotiation of an informal resolution and execution of the IR Agreement between Haley and Tanner.

29. In addition to coercing Haley to accept engaging in the informal resolution process and signing the IR Consent, Andrea had various meetings and exchanged multiple emails with Haley where Andrea explained the informal resolution process, proposed and drafted terms of solutions for the IR Agreement, presented and negotiated resolution proposals back and forth with Haley and Tanner, and repeatedly urged Haley to agree to an informal resolution promptly.

30. By assigning Andrea, an investigator, to facilitate an informal resolution to Haley's claims, Texas Tech intentionally prioritized institutional interests over a prompt, fair, and equitable resolution of the matter. Texas Tech selected as facilitator an individual that could—and did—influence Haley to accept an informal resolution and execute the IR Agreement to, on information and belief, minimize the risks to the school, such as avoiding public scrutiny, lawsuits, negative publicity, and loss of funding.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                      **PAGE 9**

> **d. Texas Tech intentionally dragged out the grievance procedures until Haley agreed to an informal resolution.**

31.     Texas Tech intentionally and unreasonably delayed the conclusion of the grievance procedure initiated by Haley.[5] Haley first reported the rape to Texas Tech on November 6, 2023. Only on or around May 31, 2024, two hundred and seven (207) days later—almost 7 months—, Texas Tech SCRMS disclosed a copy of an unfinished draft of the Investigation Report prepared by Andrea for Haley's review. No hearing panel had been or was ever scheduled.

32.     As stated above, as soon as Haley filed a formal complaint with Texas Tech, SCRMS employees started pressuring Haley to accept an informal resolution. Thereafter, SCRMS employees, including Andrea and Meredith, continued insisting with Haley to propose a resolution that Tanner would agree upon, even though Haley had submitted multiple offers which he declined.

33.     This back-and-forth process lasted several months and, in the meantime, instead of continuing the grievance process and scheduling a hearing, Texas Tech intentionally dragged the case on as long as it could until Haley finally executed the IR Agreement.

34.     One of the strategies used by Andrea to drag out the grievance process and make Haley feel compelled to agree to an informal resolution was to require Haley to tell her story multiple times to different staff and in multiple meetings. Haley described the facts, at least, (i) once to the Community Advisor, (ii) then to personally file a Sexual Misconduct Formal Complaint, (iii) on November 9, 2023, during an interview with Andrea, and (iv) on February 2, 2024, during a follow-up interview with Andrea. In addition to these instances, Haley had multiple

---

[5] Regardless of an agreement to participate in an informal resolution process, grievance procedures are not interrupted until and if the parties agree to a resolution at the conclusion of the informal resolution process.
34 C.F.R. §106.44(K)(3)(IV) (2025). Further, under Title IX, students are entitled to a prompt, fair, and equitable resolution of complaints of sex discrimination. 34 C.F.R. §106.45(A)(1) (2025).

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                      **PAGE 10**

meetings with Meredith, Andrea, and others at Texas Tech, when she had to retell her version of the facts.

35.     Notably, from November 6, 2023, the date Haley filed her complaint, until her last formal interview with Andrea, on February 2, 2024, almost three months had already passed. In this interim, Andrea interviewed (i) Haley's friend Rylan Berry, (ii) Jeweljana Helm, the Community Advisor to whom Haley first reported the sexual assault, (iii) Kenzie Segleski, Haley's roommate at the time of the assault, and (iv) Jacob Hall, Tanner's roommate at the time of the assault. Andrea also interviewed Tanner at least two times, on November 29, 2023—more than three (3) weeks after the rape—, and, again, on March 5, 2024, the last formal interview conducted by Andrea in the course of investigations.

36.     The fact that Andrea conducted at least eight (8) interviews, including multiple interviews with Haley and Tanner, throughout several months in the course of her investigation shows a deliberate intent to delay and coerce because Title IX regulations establish that the standard of proof to determine whether sex discrimination occurred is merely preponderance of evidence ("more likely than not"). 34 C.F.R. § 106.44(H)(1) (2025).

37.     By the end of November 2023, Texas Tech had gathered at least the following evidence: (i) one formal complaint filed by Jeweljana Helm, the Community Advisor, (ii) another formal complaint filed by Haley, (iii) Haley's oral statement with her version of the facts, (iv) Tanner's oral statement with his version of the facts, (v) videos of Haley in the dorm building at the time of the incident, (vi) Haley's text messages, (vii) photos of several bruises across Haley's body after the event, (viii) oral statements of, at least, three (3) witnesses, (ix) Tanner's text messages and call log, and even (x) Tanner's Netflix log on the date of the event. Also by the end of November 2023, Haley had reported the sexual assault to the Texas Tech Police, and submitted

to SANE exam at Voice of Hope, which partners with Texas Tech to provide free services for Texas Tech and community member victims of sexual assault. All the above evidence corroborated Haley's version of the facts. In fact, according to the Investigation Report, Tanner admitted that he had never "hung out" with Haley before the incident, that he did grab Haley's neck that night, that he removed Haley's shorts and underwear and "fingered" her for several minutes, and that Haley was bleeding from her vagina on that occasion. Tanner's admission, paired with all other evidence that Haley did not consent to sexual contact and that she had, in fact, suffered injuries from this contact, was sufficient evidence for a finding of responsibility against Tanner by a preponderance of the evidence by the end of November 2023. Unsurprisingly, the follow-up interview with Tanner conducted by Andrea on March 5, 2024 generally addressed pointless, irrelevant information, *i.e.*, what was playing on his TV and Bluetooth speakers during the assault.

38.    Although this last interview took place on March 5, 2024, Andrea only shared a copy of an unfinished draft for Haley's review almost three (3) months later, on May 31, 2024. No hearing was ever scheduled to assess Tanner's responsibility and impose sanctions. In fact, on multiple occasions, Andrea provided estimates that the hearing was going to happen at a certain future date (first, at the beginning of May, then mid-May, then mid-June, then July 2024) that kept being intentionally postponed until Haley executed the IR Agreement, when a hearing would no longer be necessary. Andrea used the information that a hearing was going to allegedly happen soon as a threat to pressure Haley to agree to an informal resolution as Andrea knew that Haley was vulnerable and a hearing would be too emotionally taxing for her.

39.    Although the SCRMS took several months to conclude its investigation of the case, Andrea, Meredith, and others at Texas Tech were, in contrast, very efficient in contacting Haley and repeatedly asking for informal resolution proposals and an agreement. The effort Texas Tech

put into getting a proposed resolution from Haley that was acceptable to Tanner in order to have the IR Agreement executed was disproportionate when compared with the minimal efforts towards a prompt conclusion of the investigation and hearing. Clearly, Texas Tech intentionally delayed the grievance process to have an informal resolution finalized before a finding of responsibility and sanctions against Tanner.

### e.  The informal resolution pushed by Texas Tech was bluntly disproportionate.

40.    Ultimately, and after a long period of insistence by Texas Tech SCRMS employees, Haley agreed to resolve the matter by agreeing to a No-Contact Order and to Tanner receiving some training on Sexual Misconduct/Harassment, contributing $500.00 to Voice of Hope, and submitting a reflective essay of no less than 500 words on the importance of consent.

41.    Haley was violently raped by Tanner, a Texas Tech student with whom she did not have a previous intimate relationship, in a Texas Tech dorm. Instead of pursuing a formal investigation, holding a grievance hearing, making a finding of responsibility, and applying disciplinary sanctions against Tanner, Texas Tech coerced Haley, the victim, to allow Tanner to get away with it and continue his college life with the minor inconvenience of having to take a course, make a donation, and write an essay.

42.    According to the Texas Tech Sexual Misconduct & Title IX Violations Student Sanction Matrix,[6] the sanction for a student that engages in sexual assault ranges from suspension for at least one academic year, to permanent expulsion. The outcome of this case is absurd when compared to the sanctions Tanner should have suffered had Texas Tech moved on with the grievance process.

---

[6]    Texas    Tech    University,    *Texas    Tech    Clery    Compliance:    Sanctions    and    Remedies*, https://www.depts.ttu.edu/titleix/sanctioningmatrix.pdf (last visited Nov. 5, 2025).

**PLAINTIFF'S ORIGINAL COMPLAINT**                                          **PAGE 13**

43.    Under the IR Agreement executed by Haley, a violation of the agreement would result in the SCRMS re-opening the investigation of original matter which the agreement intended to resolve. Nevertheless, Texas Tech never informed Haley of Tanner's compliance (or failure to comply) with the terms of the IR Agreement. On information and belief, Texas Tech failed to monitor Tanner's compliance with the IR Agreement. On information and belief, Texas Tech did not reopen the grievance process against Tanner after the IR Agreement.

**f.    Texas Tech continued to act with deliberate indifference as to the sexual assault Haley suffered.**

44.    In addition to intentionally delaying conclusion of its investigations for several months, coercing Haley to participate in an informal resolution process and ultimately execute the IR Agreement, and assigning a biased investigator to facilitate the informal resolution, all in violation of Title IX regulations, Texas Tech was deliberately indifferent in many additional ways.

45.    Texas Tech failed to inform Haley of proportional remedial actions—if any—taken against Tanner, such as required participation in educational programs, housing reassignment or removal from campus housing, disciplinary probation, suspension, expulsion, or revocation of degree.

46.    Texas Tech further failed to prevent encounters between Haley and Tanner on campus. Instead, throughout the entire grievance process, Texas Tech representatives pressured Haley to negotiate back and forth with Tanner an informal resolution for dismissal of the case with no right to appeal. In other words, Texas Tech prioritized getting the case off its officer's desk over ensuring fairness, transparency, and accountability in Haley's process.

47.    Texas Tech also failed to provide Haley with reasonable accommodations to help her continue pursuing her education safely. Haley attempted to seek counseling within Texas Tech, but the earliest available appointment would take months, and Texas Tech provided no priority to

Haley, even though she had been a victim of on-campus rape by another Texas Tech student. Haley also attempted to move to a different dorm room or residence hall to avoid contact with Tanner. However, the few relocation options offered by Texas Tech were actually punitive and had no consideration to her comfort, safety, mental health, and other personal circumstances, including because Texas Tech sought to move Haley to inconvenient locations.

**II.    TEXAS TECH EFFECTIVELY BARRED HALEY'S ACCESS TO EDUCATIONAL OPPORTUNITIES AND BENEFITS.**

48.    While Tanner continued his academic life with no major interferences as a result of the Title IX complaint filed by Haley, Haley was effectively barred from access to educational opportunities and benefits. Following the sexual assault, and as a result of Texas Tech's indifference, Haley avoided leaving her dorm room unless absolutely necessary. Haley missed several classes, including math, anatomy, and English. In fact, Haley failed an English course she took during the summer of 2024. Haley missed various extracurricular activities, such as church and other campus events. The trauma from the incident had a long-term impact on Haley's education, leading her to seriously consider changing majors and exploring a completely different career path.

49.    Further, Haley has moved out of Lubbock and currently attends Texas Tech as a fully remote student. Tanner was never prohibited from taking the same classes as Haley, and, as stated above, Texas Tech engaged in no efforts to prevent encounters between Haley and Tanner on campus. As a result, after the sexual assault, Haley and Tanner continued attending classes together.

50.    Enrollment period was a nightmare for Haley, as she would enroll in courses and have no alternative option but to wish that she and Tanner did not end up in the same classroom. The stress of possibly encountering Tanner caused Haley to attend college online, and miss social

interaction and campus life, including opportunities to join clubs and participate in campus events, among other opportunities such as mentorship and career opportunities.

## CAUSES OF ACTION

### COUNT ONE: TITLE IX VIOLATION
### Against Texas Tech

51.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

52.    TTU is liable under Title IX for knowingly acting with deliberate indifference in response to the sexual assault suffered by Plaintiff and committed by Tanner, which was based on Plaintiff's sex.

53.    Tanner was under TTU's control as a TTU student, and the rape occurred at an on-campus residence hall, where both Plaintiff and Tanner lived while attending college.

54.    TTU had actual knowledge of the sexual assault against Plaintiff as Plaintiff reported the incident the next day to the Office of Student Civil Rights and Sexual Misconduct, the office responsible for addressing and remedying sexual assault incidents at TTU.

55.    TTU acted with deliberate indifference to the sexual assault suffered by Plaintiff. Specifically, Texas Tech SCRMS employees took advantage of Plaintiff's fragile situation after the rape to pressure Plaintiff to agree to an informal resolution by constantly repeating that a formal grievance process would force Plaintiff to relive her trauma over and over, and that the process could take a long time to finish with no certainty of a satisfying outcome.

56.    Further, TTU deliberately assigned Andrea Regalado, the investigator in charge of Plaintiff's case, to facilitate the informal resolution process between Plaintiff and Tanner while TTU intentionally prioritized institutional interests over a prompt, fair, and equitable solution of the matter.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **PAGE 16**

57.     TTU intentionally delayed the grievance procedure against Tanner until SCRMS employees succeeded in coercing Plaintiff into signing the IR Agreement, when TTU could have held a grievance hearing by the end of November 2023, as TTU had collected sufficient evidence for a finding of responsibility by a preponderance of evidence by that date. While TTU dragged out the grievance procedure, SCRMS employees invested significant efforts into getting a proposed resolution from Plaintiff that was acceptable to Tanner in order to have the IR Agreement executed and avoid sanctioning Tanner.

58.     TTU failed to inform Plaintiff of proportional remedial actions—if any—taken against Tanner, such as required participation in educational programs, housing reassignment or removal from campus housing, disciplinary probation, suspension, expulsion, or revocation of degree. Instead, TTU coerced Plaintiff into signing the IR Agreement, which allowed Tanner to get away with raping a TTU student, and continue his college life with the minor inconvenience of having to take a course, make a donation, and write an essay. Moreover, Texas Tech never informed Plaintiff of Tanner's compliance (or failure to comply) with the terms of the IR Agreement.

59.     TTU also failed to provide Plaintiff with reasonable accommodations to help her continue pursuing her education safely. Plaintiff attempted to seek counseling within TTU, but the earliest available appointment would take months, and TTU provided no priority to Plaintiff, even though she had been a victim of on-campus rape by another TTU student.

60.     Plaintiff also attempted to move to a different dorm room or residence hall. However, the few relocation options offered by TTU were actually punitive and had no consideration for her comfort, safety, mental health, and other personal circumstances. Additionally, TTU further failed to prevent encounters between Plaintiff and Tanner on campus.

61.     The sexual assault suffered by Plaintiff was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff's access to educational opportunities and benefits. Particularly, after the rape, and as a result of TTU's indifference, Plaintiff avoided leaving her dorm room unless absolutely necessary, missed several classes, and failed an English course. Plaintiff also missed various extracurricular activities. The trauma from the incident had a long-term impact on Plaintiff's education, leading her to seriously consider changing majors and exploring a completely different career path.

62.     TTU's deliberate indifference further barred Plaintiff's access to educational opportunities and benefits insofar as Plaintiff had to leave Lubbock and move to a fully remote program at TTU to avoid encounters with Tanner, as TTU implemented no measures to prevent Plaintiff and Tanner from taking classes together. As a result, Plaintiff missed social interaction and campus life, opportunities to join clubs and participate in campus events, mentorship and career opportunities.

63.     Moreover, TTU has systematically failed to effectively prevent, investigate, and sanction sexual misconduct within the university. Accordingly, TTU has maintained a policy of deliberate indifference that created a heightened risk of sexual misconduct that was known or obvious, such as the sexual assault suffered by Plaintiff, and TTU officials disregarded that risk.

64.     TTU's Title IX violation proximately caused damages to Plaintiff, including damages for loss of educational opportunities and benefits, past and future medical expenses, education-related expenses, and relocation costs.

## COUNT TWO: SEXUAL ASSAULT
### Against Tanner

65.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

66.    Tanner committed an assault on Plaintiff by offensive physical conduct for which Tanner is directly liable. Specifically, and as set forth herein, Tanner acted intentionally or knowingly when making direct physical contact with Plaintiff's person. Tanner knew or reasonably should have known that Plaintiff would regard the contact as offensive or provocative. Tanner caused injury to Plaintiff.

67.    At all relevant times, Tanner intended and acted with the intent to cause a harmful contact with Plaintiff's most intimate parts, including, but not limited to, her vagina, neck, mouth, and hips. Without her consent, Tanner kissed and grabbed Plaintiff aggressively for several minutes while pressing her neck and collarbone against his bed to prevent Plaintiff from escaping. Tanner removed Plaintiff's clothes, introduced his fingers in her vagina, and digitally penetrated her for several minutes. Plaintiff did not consent to such physical contact, and attempted to stop Tanner by begging him to stop and trying to push him off her multiple times.

68.    Tanner committed sexual assault by engaging in digital penetration of Plaintiff's vagina without Plaintiff's explicit and/or effective consent. Tanner's actions intentionally or knowingly caused injury to Plaintiff. Plaintiff suffered bodily injury, such as, but not limited to, injuries to her body, including on her neck, collarbone, and hips, vaginal lacerations, bleeding, and severe vaginal pain.

69.    Accordingly, Plaintiff is entitled to recover actual damages for the injuries inflicted by Tanner, including physical pain and mental anguish. Further, Plaintiff is entitled to exemplary damages resulting from malice, pursuant to TEX. CIV. PRAC. & REM. CODE §41.003(A)(2).

## COUNT THREE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Tanner

70.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                   **PAGE 19**

71. Tanner intentionally or recklessly subjected Plaintiff to extreme and outrageous conduct that was so extreme in degree and outrageous in character that it went beyond all possible bounds of decency. Specifically, Tanner convinced Plaintiff to enter his dorm room to allegedly watch TV when, in fact, Tanner intended to rape her. Tanner and Plaintiff had no previous history of intimate relationship, and they had previously met before the sexual assault only briefly in an elevator encounter. In his room, Tanner kissed and grabbed Plaintiff aggressively without her consent for several minutes while pressing her neck and collarbone against the bed to prevent Plaintiff from escaping. Tanner violently removed Plaintiff's clothes and digitally penetrated Plaintiff until she started bleeding, while Plaintiff begged Tanner to stop and attempted to push him away.

72. Such conduct by Tanner proximately caused Plaintiff emotional distress, which was severe insofar as it caused Plaintiff embarrassment, fright, horror, grief, shame, humiliation, and worry. As a result of Tanner's conduct, Plaintiff suffered severe impact on her mental and physical health, including anxiety, crying spells, sleep deprivation, and disassociation. To this date, Plaintiff continues to struggle with severe anxiety, flashbacks, and emotional instability as a consequence of Tanner's conduct. Plaintiff is entitled to exemplary damages resulting from malice, pursuant to TEX. CIV. PRAC. & REM. CODE §41.003(A)(2).

## DAMAGES AND ATTORNEYS' FEES

73. Plaintiff hereby demands an award for all of Plaintiff's reasonable attorneys' fees incurred in bringing this action against the Defendants, whether based upon an applicable contract or applicable statute.

## JURY DEMAND

74. Plaintiff hereby demands a trial by jury on all causes of action.

## <u>PRAYER FOR RELIEF</u>

Accordingly, Plaintiff prays the Court enter judgment awarding her the following relief:

a.      Actual damages;

b.      Consequential damages;

c.      Compensatory and/or special damages;

d.      Equitable relief;

e.      Exemplary damages;

f.      Reasonable and necessary attorneys' fees;

g.      All costs of court and pre-judgment and post-judgment interest at the highest rate permitted by law; and

h.      All other relief to which Plaintiff is entitled.

November 6, 2025

Respectfully submitted,

**CHAMPION LLP**

*/s/Austin Champion*

Austin Champion
Texas Bar No. 24065030
Austin.Champion@championllp.com

Thaís Amaral Dourado
Texas Bar No. 24136704
Thais.Dourado@championllp.com
----

2200 Ross Avenue, Suite 4500W
Dallas, Texas 75201
214-225-8880 | Main
214-225-8881 | Fax

**COUNSEL FOR PLAINTIFF**